COMMONWEALTH v. CHARLES CLEARY.

APPEAL BY DEFENDANT FROM THE COURT OF OYER AND TER-
MINER OF CLINTON COUNTY.

Argued April 21, 1890—Decided May 19, 1890.
[To be reported.]

1. On the trial of a criminal charge, evidence of the good character of the defendant is always admissible, and it is to be weighed and considered by the jury in connection with all the evidence in the cause; in some instances it may of itself create the reasonable doubt which will entitle the accused to an acquittal: Heine v. Commonwealth, 91 Pa. 145.

2. Such evidence, on the trial of an indictment for murder, is applicable to the degree of the crime, as well as to its commission by the accused; and, although the commission of the homicide be conceded and the only dispute be as to whether it was murder of the first degree, it is to be submitted for due consideration: Hanney v. Commonwealth, 116 Pa. 323.

3. An instruction that " good character is always of importance and is evidence to be duly considered by the jury, and may turn the scale when there is a reasonable doubt as to the degree or grade of the crime," thus limiting the benefit of good character to cases where the guilt of the accused is otherwise doubtful, is erroneous:. Kilpatrick v. Common-wealth, 31 Pa. 198, explained.

4. When the life of an accused may depend upon a single word, the use of language in a charge cannot be attended to with too much care; and it is the duty of the Supreme Court, when reviewing it, to weigh every word carefully, without conjecture as to how far the jury may have been influenced by an erroneous instruction: Per Mr. Chief Justice PAXSON.

5. It is not competent to prove the state of intoxication of a defendant, at the time of committing a homicide, by showing the condition of a companion who had been drinking with him and had taken the same

number of drinks, although it is proposed to follow the offer with proof that defendant was of a nervous temperament and younger than his companion.

6. On a trial for murder, it is not error to charge that, when not committed in the perpetration or attempt to perpetrate any of the felonies specified in § 74, act of March 31, 1860, P. L. 402, the essence of murder in the first degree is the intention to kill, and that intoxication of the accused will not palliate the offence unless so great as to render him incapable of conceiving an intent.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 265 January Term 1890, Sup. Ct.; court below, No. 1 May Term 1889, O. & T.

On May 13, 1889, the grand jury returned as a true bill an indictment charging Charles Cleary with the murder of Philip Paul. The defendant pleaded not guilty.

At the trial on May 14, 1889, testimony for the commonwealth tended to establish the following facts:

Between 11 and 12 o'clock on the night of March 12, 1889, Philip Paul was found lying in front of the borough lock-up, in the borough of Renovo. Examination revealed a bullet wound in his head, from the effect of which he died in a few hours.

The deceased was the chief of police in Renovo, and as such had authority under § 3, act of March 12, 1869, P. L. 344, extended to Renovo by act of February 17, 1872, P. L. 113, and an ordinance of said borough, to arrest, without previous complaint, persons found disturbing the peace or behaving in a disorderly manner in the streets or other public places. The defendant, Charles Cleary, was nineteen years of age, resided with his parents in Renovo, and was employed as a machinist in the shops of the Pennsylvania Railroad Company. A short time prior to his death, the deceased lectured the defendant and others in regard to their conduct, telling them that "if they did not behave themselves, he would certainly put them in the lock-up." More than once the defendant was heard to say that if officer Paul attempted to put him in the lock-up, he would kill him.

On the evening of March 12, 1889, the defendant met David Belford, an intimate friend and fellow-workman, as early as half

Statement of Facts.

past seven, and the two spent the evening together, going about the town and visiting different drinking saloons, at times in the company of others and at times by themselves. Between ten and eleven o'clock the two met Edward Tillman on the street. Belford tried to pick a quarrel with Tillman on account of a remark made by the latter a few days before, but the defendant acted as a peace-maker, telling Tillman to go home, and requesting Belford to go along with himself. During the conversation with Tillman, the defendant remarked that he wished Paul would come along; he would like to put a ball in him, displaying a revolver while saying this. Tillman and other witnesses who saw the defendant about this time, testified that he did not exhibit much evidence of drunkenness.

Remaining in the same locality, the defendant and Belford were joined by three other young men, who had also been drinking, and the five commenced to go through some sort of military drill upon the street. While they were so engaged, officer Paul, who was on duty and in uniform, came along the street. He ordered the boys to go home, and, taking hold of Belford, started him up the street. All the boys, except the defendant, started off in obedience to Paul's directions, but when he returned after starting Belford away, he found the defendant still standing there. The defendant made some remark, which was not heard by any of the witnesses, after which the officer said, "Well, I will take you;" and seizing hold of him, started with him to the lock-up. On the way, the defendant was heard complaining about being choked, and talking in a loud voice. Soon after, a pistol shot was heard, when the defendant was seen to run out of the narrow street or alley in which the lock-up was situated, and Paul's body was discovered. The course of the bullet and the surrounding circumstances indicated that the deceased was in a stooping position, unlocking the door of the lock-up, or turning on the electric lamp by which it was lighted, at the time the shot was fired.

When the defendant, running out of the alley, reached Huron avenue, he saw three young men on the opposite side of the street, and supposing, as he afterwards stated to one of the witnesses, that they were the same persons who had been with him previously, he called to them "good-by my honies, I'm going." He kept on, running very rapidly, and soon passed out of sight.

Later in the night, after having gone to his home and seen his mother, he appeared at the residence of his uncle, stated that he thought he had shot Paul, sent his uncle to his father's house after some money and clothes, and after getting them, started on foot to go to New York state. His uncle accompanied him as far as a deserted hunter's camp, six miles distant, and there left him. On the succeeding afternoon, in consequence of the impassable condition of the roads, the defendant concluded to take to the railroad and get upon a freight train. He did so, was put off the train several times, but each time got on again. Being questioned by one of the train hands he gave a false name and a false account as to the occasion of his journey. The flagman recognizing him, he was about to jump off the train, which was moving at a rapid rate, but was dissuaded by promises that if he would remain on it he would be assisted to escape. The flagman engaged him in conversation about the killing. What the defendant said about it was related upon the trial, by the flagman, as follows:

Q. What did he say? A. He said him and young Belford were up at the corner having a racket with a couple of fellows, and Paul came along and told them to go home; and he said Belford went home and he stood there and gave Paul some chin, and Paul went to arrest him and he tore loose from him. And then, he said, two fellows came and shoved him into Paul's arms and then he took him down to the lock-up and wanted to put him in; and "I shot him." And he says, "I don't know how I happened to have the revolver in my pocket, it was my brother's revolver;" but he says, "it is something I never carry," and he says "I didn't mean to kill that man;" says, "I wanted to shoot over his head and stun him;" says "I don't know how I came to get so low." Q. State whether or not anything was said about the remark made to Paul about the time he wanted to put him in the lock-up? A. Yes, sir; he says, "when I got down to the lock-up," he says, "I said to him, I'll be damned if I'll be put in there by a thing like you."

When the train stopped at Emporium, the defendant was arrested by officers who were in waiting in pursuance of a telegram which the conductor had sent on ahead after learning his identity.

The defendant did not deny upon the trial that he killed the

Statement of Facts.

deceased, nor did he contend that the killing did not amount to murder.   His defence related solely to the question whether or not it was murder in the first degree ; and he presented testimony tending to show that he had been drinking during the evening of the killing to such an extent as to be grossly intoxicated.   He testified on his own behalf that he had no recollection of firing the shot, or of anything else that occurred at the lock-up, except his hearing a shot, falling, or being pushed down, and getting up and seeing Paul lying there, after which he remembered nothing more until he found himself awake on the outside of the town; that he remembered making no threats against Paul that evening, and had made none previous thereto ; that he was first informed that Paul was dead while upon the freight train, previous to his arrest, and when he saw the officers were going to arrest him, he had " a kind of an idea " what it was for; thought it was "for having trouble with Paul or breaking away from him, something of that kind ; " that he did not recollect making the statements testified to by the flagman.

Belford, testifying for the defendant, stated with minuteness the number of drinks taken by the defendant and himself at each saloon they visited on the evening of the killing.   According to his testimony the defendant had taken eighteen or twenty glasses of beer, some of them large glasses known as boot-legs, one drink of wine, and one of whiskey.   According to the testimony of the defendant himself, and another witness, the number of glasses of beer taken by him was not more than sixteen. Belford was cross-examined by the commonwealth's counsel as to the extent to which he was affected by the drinking he had done and the clearness of his recollection, and in response to their questions stated that he had a clear recollection of all that he had testified to; that he was "not so awful drunk; " and that he and the defendant were in about the same degree of drunkenness.

The defendant called Dr. D. J. Reese, who testified that the deceased was carried to the office of the witness on the evening of the shooting, and that Belford was there at the same time. The defendant's counsel then made an offer to prove by the witness that since Belford, being the same person who is now shown to have been drinking at different saloons with defend-

ant, during the evening of the alleged killing, and to have drunk every time and no oftener than defendant, and with one exception drank each time the same kind of drink as defendant, when he came to witness' office was very much intoxicated, so much so that he feared he would break the window of his office and he was compelled to remove him from the office : to be followed by proof that Belford is older than defendant; it further appearing by the evidence that Belford is under the age of twenty-one years; and further, to prove that defendant is of a nervous temperament, and therefore more susceptible to the influence of intoxicating liquors than Belford.

Objected to by commonwealth : 1. As irrelevant, because Belford is not a party to this issue, and his condition would afford no light as to the condition of Cleary about 10:20 or 10:30 when Paul was shot. 2. That the offer as to drunkenness proposes a hypothetical case, there being no rule or evidence to show that liquor had like effect on Cleary and Belford. 3. That the mere fact of Cleary being of a nervous temperament, and therefore more susceptible to the influence of liquor than Belford is a hypothetical case and cannot be made out by comparison with another person. The witness cannot express any opinion of Cleary's greater nervousness and susceptibility to liquor, unless he saw Cleary the night of the killing and could thus judge of his condition that night. 4. The offer does not amount to a defence if true.

By the court : Objection sustained ; exception.[1]

A number of witnesses testified for the defendant that his reputation as a peaceable, inoffensive citizen was good.

At the close of the testimony, the court, MAYER, P. J., charged the jury in part as follows :

That Philip Paul was killed by the hand of violence on the night of March 12, 1889, at Renovo, in this county, and that the perpetrator of the crime was the prisoner, Charles Cleary, is not questioned by the counsel for the prisoner, but it is contended and urged that, by reason of the intoxication of the prisoner, at the time of the commission of the act, the crime of which the prisoner is guilty is of no higher grade than murder in the second degree. This concession of the prisoner's counsel will simplify the inquiry on the part of the jury and

Charge of Court below.

limit their investigations to the ascertainment and determination of the grade or degree of crime of which, under the evidence, the defendant should be convicted. It will, therefore, become necessary for the court to explain to the jury, as clearly and correctly as we can, the distinguishing characteristics between murder in the first and murder in the second degree.

Murder, as defined by the common law, is where a person of sound memory and discretion unlawfully kills any reasonable creature in being and in the peace of the commonwealth, with malice prepense or aforethought, either express or implied. The distinguishing criterion of murder is malice aforethought. But it is not malice in its ordinary understanding alone,—a particular ill-will, a spite or a grudge. Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Murder, therefore, at common law, embraces cases where no intent to kill existed, but where the state or frame of mind termed malice, in its legal sense, prevailed.

In Pennsylvania, the legislature, considering that there was a manifest difference in the degree of guilt where a deliberate intention to kill exists and where none appears, distinguished murder into two grades, murder of the first and murder of the second degree; and provided that the jury before whom any person indicted for murder should be tried shall, if they find him guilty thereof, ascertain in their verdict whether it be murder of the first or murder of the second degree. By the act of March 31, 1860, " all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder of the first degree, and all other kinds of murder shall be deemed murder of the second degree." [When not committed in the perpetration of or attempt to perpetrate any one of the felonies named in the statute, the intention to kill is the essence of murder in the first degree.] [6]

Therefore, if an intention to kill exists, it is wilful; if this

Charge of Court below.

intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate ; and if sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated. The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances in evidence. A learned judge has said : " It is equally true, both in fact and from experience, that no time is too short for a wicked man to frame in his mind his scheme of murder, and to contrive the means of accomplishing it." But this expression must be qualified, lest it mislead. It is true that such is the swiftness of human thought that no time is so short in which a wicked man may not form a design to kill and frame the means of executing his purpose, yet this suddenness is opposed to premeditation, and the jury must be well convinced, upon the evidence, that there was time to deliberate and premeditate. The law regards, and the jury must find, the actual intent ; that is to say, the fully-formed purpose to kill, with so much time for deliberation and premeditation as to convince them that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. If there be time to frame in the mind, fully and consciously, the intention to kill, and select the weapon or means of death, and to think and know beforehand, though the time be short, the use to be made of it, there is time to deliberate and premeditate.

The proof of the intention to kill, and of the disposition of the mind constituting murder of the first degree, under the act of assembly, lies on the commonwealth. But this proof need not be express or positive. It may be inferred from the circumstances. If, from all the facts attending the killing, the jury can fully, reasonably and satisfactorily infer the existence of the intention to kill, and the malice of heart with which it was done, they will be warranted in so doing. He who uses upon the body of another, at some vital part, with a manifest intention to use it upon him, a deadly weapon, as an axe, a gun, a knife or pistol, must, in the absence of qualifying facts,

Charge of Court below.

be presumed to know that his blow is likely to kill, and, knowing this, must be presumed to intend the death, which is the probable and ordinary consequence of such an act. He who so uses a deadly weapon, without a sufficient cause of provocation, must be presumed to do it wickedly, or from a bad heart. Therefore, he who takes the life of another with a deadly weapon, and with a manifest design thus to use it upon him, with sufficient time to deliberate and fully to form the conscious purpose of killing, and without any sufficient reason or cause of extenuation, is guilty of murder in the first degree.

Murder in the second degree is where a felonious and malicious homicide is committed, but without any specific intention to take life. All murder not of the first degree is necessarily of the second degree, and includes all unlawful killing under circumstances of depravity of heart, and a disposition of mind regardless of social duty, but where no intention to kill exists, or can be reasonably or fully inferred; therefore, in all cases of murder, if no intention to kill can be inferred or collected from the circumstances, the verdict must be murder in the second degree.

It may be stated as a general rule that all homicide is presumed to be malicious,—that is, murder of some degree,—till the contrary appears in evidence. But, though a homicide is presumed to be murder, it is not presumed to be murder of the first degree. The presumption against the prisoner rises no higher than murder of the second degree, till it is shown by the commonwealth to be murder of the first degree. It, therefore, lies on the commonwealth to satisfy the jury of those facts and circumstances which indicate a deliberate intention to kill, and the cool depravity of heart and conscious purpose which constitutes, as before stated, the crime of murder in the first degree. And in the solution of the question of the intent with which the act was done, the nature of the weapon and the place and character of the wound are matters to be considered by the jury. The deadliness of the weapon tends to indicate the intent with which it was used. And, as evidence bearing also upon the question of intent, the commonwealth has introduced the testimony of witnesses going to show that, prior to the commission of the crime, the prisoner made threats at different times and to different persons that he would take the life of the deceased.

Charge of Court below.

—After quoting the testimony of several witnesses respecting threats made by the defendant against the deceased, the court proceeded:

The testimony of these witnesses is contradicted by the testimony of David Belford, J. F. Nester, and the prisoner, who concur in testifying that the conversations had with Cleary and which had been related by the witnesses for the commonwealth, did not take place, and they deny that Cleary made any such statements. It must be remembered, however, that although the prisoner is made a competent witness under the act of assembly, the credibility of his testimony is for the jury. He is a witness deeply interested in the result of the prosecution; his life or his liberty is dependent upon the result, and he is testifying under a great temptation to shield himself from the consequences of his crime. His evidence must be closely and carefully scrutinized by the jury, when weighed in the balance against the evidence of disinterested witnesses.

The jury must pass upon the credibility of the witnesses, where there is a conflict of testimony, and determine where the truth lies. In deciding upon the case, it is the duty of the jury to give the prisoner the benefit of any reasonable doubt, arising out of the evidence, which prevents them from coming to a satisfactory conclusion, a doubt which causes your minds to pause and hesitate. But this doubt must fairly arise out of the evidence, and not be merely fancied or conjured up. It must be an honest doubt; such a difficulty as fairly strikes a conscientious mind and clouds the judgment. Presumptions are in favor of innocence until proof has fairly established guilt. If the mind be fairly satisfied of a fact on the evidence, as much so as would induce a man of reasonable firmness and judgment to take the fact as true and to act upon it in a matter of importance to himself, it would be sufficient to rest a verdict upon.

Having instructed you upon the law of the crime, we come now to consider the defence of intoxication set up in this case, by the prisoner, for the purpose of reducing the grade of the crime. Drunkenness is no excuse for crime. If a man makes himself voluntarily drunk, it is no excuse for any crime he may commit while he is so; he takes the consequences of his

own voluntary act, or most crimes would go unpunished. While intoxication of itself is no defence to the fact of guilt, yet it is evidence to be considered by the jury upon the question of intent or premeditation, for the purpose of determining the degree of the crime. In this state, where the act of assembly resolves murder into two degrees, in which the distinguishing test between murder in the first and murder in the second degree is a specific intent to take life, [the intoxication of the prisoner may be material, and is evidence to be considered by the jury for the purpose of enabling them to determine whether at the time of the commission of the crime the prisoner was so much intoxicated and his intellect so clouded, as to deprive him of the power to think and weigh the nature of the act committed.] [3] The intent to take life, with a full and conscious knowledge of the purpose to do so, is the distinguishing criterion of murder in the first degree; and this consciousness of the purpose of the heart is defined by the words, deliberately, and premeditatedly. It therefore becomes important for the jury to ascertain and determine from the evidence what was the frame or state of mind of the prisoner at the time the deadly shot was fired. [Was he able to deliberate and premeditate the homicide?] [3] And the jury should carefully examine and consider the evidence bearing upon the intoxication of the prisoner, both that which has been adduced by the prisoner and by the commonwealth.

—The court here reviewed the testimony upon the subject of the prisoner's intoxication, and then continued:

The jury can also take into consideration the conduct of the prisoner immediately after the commission of the crime and what was then said and done by him, as evidence tending to show the mental condition of the prisoner.

We have now called to your attention, in a summary way, the evidence bearing upon the important issues involved in this case. If we have failed or omitted to call your attention to any of the evidence, it is nevertheless the duty of the jury to consider and weigh carefully all the evidence. Under the indictment, the defendant can be convicted either of murder in the first or murder in the second degree, and it is the duty of the jury to determine in their verdict of what degree the defendant is guilty. If the facts as disclosed by the

Charge of Court below.

evidence satisfy you beyond a reasonable doubt that the defend-
ant committed the crime wilfully, deliberately and premedita-
tedly, you should find him guilty of murder of the first degree.
But if not satisfied beyond a reasonable doubt that the crime
was committed with deliberation and premeditation, and with
intent to take life, you should find him guilty of murder in
the second degree. The defendant has offered in evidence his
good character, and proved by a number of witnesses that
prior to the commission of this crime his reputation as a peace-
able citizen was good. [Good character is always of impor-
tance and is evidence to be duly considered by the jury, and
may turn the scale where there is a reasonable doubt as to the
degree or grade of crime.] [2]

In disposing of this case the jury must forget everything
but the law, the evidence and their duty, and pass an honest,
deliberate and fearless judgment between the commonwealth
and the prisoner. Let no consideration of pity or mercy influ-
ence you. To all tender appeals made to you by the counsel
on either side, turn a deaf ear, and determine the case solely
upon the evidence and the law as you have received it from
the court. If you find beyond a reasonable doubt that the
killing was wilful, deliberate and premeditated, and with an
intent to take the life of the deceased, then the crime is mur-
der of the first degree, and you should so return your verdict.
If, however, you find that the intoxication of the prisoner was
so great as to render it impossible for him to form a complete
design in his mind to take the life of the deceased, the law
reduces the grade of homicide from murder in the first to mur-
der in the second degree, and your verdict should be murder
in the second degree. [The mere intoxication of the prisoner
will not excuse or palliate his offence unless he was in such a
state of intoxication as to be incapable of conceiving any in-
tent. If he was, his grade of offence is reduced to murder in
the second degree.] [3]

Counsel for defendant have presented to us certain points
upon which they request instruction to the jury:

1. In order to convict the defendant of murder in the first
degree, the jury must find from the evidence, beyond a reason-
able doubt, that the defendant deliberately conceived the idea
of killing the decedent; that he meditated upon the thought

Charge of Court below.

of taking his life, and then upon a deliberately formed determination proceeded to commit the act.

2. That in order to convict of murder in the first degree, the jury must find from the evidence in the case, beyond a reasonable doubt, that the mind of the defendant was not so affected by reason of drunkenness as to be incapable of such deliberate premeditation as is necessary to constitute murder in the first degree.

3. To constitute proof beyond a reasonable doubt, such as will justify a conviction of murder in the first degree, the evidence must produce an abiding conviction in the mind of the jury, to a moral certainty, not only that Charles Cleary fired the shot that caused the death of Philip Paul, but that his mind was sufficiently clear and unbeclouded by drink to be able to form a wilful, deliberate and premeditated design to kill, and that he did form such design.

4. That in order to form a wilful, deliberate and premeditated design to kill, the jury must believe from the evidence in the cause, beyond a reasonable doubt, that the mind of Charles Cleary was conscious of the real nature of its purpose, and of the act of killing the decedent, and was capable of resisting the impulse to perpetrate the crime.

5. If the jury do not find from the evidence in the cause, beyond a reasonable doubt, that there was a wilful, deliberate and premeditated design on the part of Charles Cleary to take the life of Philip Paul, then the grade of the offence cannot rise higher than murder in the second degree.

6. That if the jury find that the defendant was, at the time of the killing, excited by any degree of drunkenness, which produced a state of mind unfavorable to deliberation and premeditation, although not so excessive as to render him incapable of forming a deliberate purpose, this condition of mind must be taken into consideration by them in determining whether the killing was done with deliberation and premeditation.

Answer: We affirm these points.

The jury returned a verdict of guilty of murder in the first degree. A rule for a new trial was subsequently discharged, the court, MAYER, P. J., filing an opinion which was in part as follows:

Opinion of Court below.

As all the reasons assigned, except the sixth and eighth, complain of errors committed by the court in their instructions to the jury, and the rejection of the testimony of Dr. Reese to prove the intoxicated condition of Belford, we have given these reasons a most careful consideration. Anxious to correct any possible error that could be discovered, we have examined the charge with careful scrutiny, and are satisfied that no injustice was done to the defendant. We will consider and dispose of these reasons in their order.

The first reason complains that the court erred in their instructions to the jury, as to the effect to be given to good character, and the court is quoted as stating to the jury in their charge : " It may turn the scale where there is a reasonable doubt as to the degree or grade of crime." The counsel has not set out in this reason all the court did say in regard to the evidence of good character, but only a disconnected part. What we said to the jury was this : " The defendant has offered in evidence his good character and proved by a number of witnesses that prior to the commission of this crime his reputation as a peaceable citizen was good. Good character is always of importance and is evidence to be duly considered by the jury, and may turn the scale where there is a reasonable doubt as to the degree or grade of crime."

Of this instruction the defendant has no cause of complaint; it was as favorable to him as he could ask. In fact, as the commission of the crime by defendant was not disputed, and the only question for the jury to determine was the grade or degree of the crime, and as the determination of that question depended upon the mental condition of the defendant, whether intoxicated or not, we are of the opinion that the evidence of defendant's good character had little relevancy. The cases referred to by counsel, as establishing the rule that evidence of good character is positive evidence and may of itself create a reasonable doubt, were cases in which there was no direct proof of the commission of the crime by the defendant, but the proof of the crime depended upon circumstantial evidence. In such cases, the Supreme Court have said that evidence of good character may create a reasonable doubt of defendant's guilt, and produce an acquittal. But in cases

Arguments.

where the commission of the crime is unquestioned, the rule has no application or relevancy. . . . . .

On January 7, 1890, judgment having been passed upon the verdict of the jury according to law, the defendant took this appeal assigning for error:

1. The refusal of defendant's offer.[1]

2. The part of the charge embraced in [ ] [2]

3. The several parts of the charge embraced in [ ] [3]

4. That the entire evidence, taken together, was not sufficient to sustain a conviction of murder of the first degree.

5. The answering of the defendant's six points together, instead of separately.

6. The part of the charge embraced in [ ] [6]

7. That the instructions to the jury respecting the alleged threats of the defendant made the testimony for the commonwealth unduly prominent and failed to inform the jury as to the weight the law attributes to that kind of evidence.

*Mr. W. C. Kress* and *Mr. C. S. McCormick*, for the appellant:

1. In view of the cross-examination of Belford by the commonwealth's counsel, the object of which was to impress upon the jury the fact that he was not much intoxicated, and to argue that therefore Cleary could not have been, the offer to show by the physician what Belford's real condition was, should have been admitted. By the cross-examination the commonwealth was enabled to get before the jury the testimony of an intoxicated man as to his condition of mind, and the defendant was not allowed to show in reply, by competent testimony, his real condition, which tended materially to establish the degree of drunkenness under which Cleary labored at the time of the killing. Further; evidence of good character is substantive and must be treated as such. It is not a mere make-weight, to determine the balance in doubtful cases, but it may of itself, by creating a reasonable doubt, produce an acquittal: Heine v. Commonwealth, 91 Pa. 145; Hanney v. Commonwealth, 116 Pa. 322.

2. The instructions respecting the degree of drunkenness which will reduce the grade of the crime below murder of the first degree, are obnoxious to the law in two views: (*a*) Their spirit, if not their letter, was to throw the burden of proof on

Arguments.

the defendant, whereas in a trial for life the burden of proof never shifts, and to convict in the first degree the commonwealth must prove the defendant to have been of sound memory and discretion.   (*b*) The law does not require, as these instructions did, that the defendant should be so intoxicated as to be unconscious, before the jury could consider his condition of intoxication in connection with the other evidence in the case: Wharton & Stille, Med. Jur., § 215, note.   The defendant had a right to have the jury consider any degree of intoxication, in connection with all the other facts and circumstances, in judging whether the act was premeditatedly and deliberately done : Jones v. Commonwealth, 75 Pa. 408.

3. Prior to the act of April 22, 1794, 3 Sm. L. 186, the offence in this case would have been punishable by death.  That act made radical changes, but the construction placed upon it by judges whose habits of thought had crystalized under the old régime was harsh, instead of liberal, as it should have been. The words, " by any other kind of wilful, deliberate and premeditated killing," should not have been lifted out of their connection and set up as an independent sentence, nor distorted, as they have been, from their usual, ordinary meaning.   The intention of the legislature was that only in extreme cases of cool, deliberate, heartless killing, should the death penalty be inflicted.   They named certain forms of killing, and the words " any other kind," etc., should be applied only to a killing of a character and nature similar to these : Monongahela Bridge Co. v. Railway Co., 114 Pa. 478.   The harsh expressions in Commonwealth v. Smith, 7 Sm. L. 696, and Commonwealth v. O'Hara, 7 Sm. L. 697, as to no time being too short to frame the intent and contrive the means to commit murder, were qualified in Commonwealth v. Drum, 58 Pa. 18.   They are inapplicable, under the act of 1794, to murder in the first degree, and as quoted to the jury in this case, they were clearly misleading.

4. The facts show very clearly that the killing was the result, not of deliberation and premeditation, nor of a spirit of revenge awaiting its opportunity, but of rashness and impetuous temper, aggravated and inflamed by drunkenness.   If the legislature had meant that a specific intent to take life was all that is necessary to constitute murder in the first degree, they could

have shortened the statute and made that meaning plainer by simply using the one word, wilful. It is true that the court, in some parts of the charge and in the answer to the defendant's points, correctly defined murder in the first degree; but how were the jury to decide between the different statements? See Pistorius v. Commonwealth, 84 Pa. 158; Forker v. Sandy Lake Bor., 130 Pa. 123; Sidney Sch. Fur. Co. v. Warsaw Sch. D., 130 Pa. 76. Further: the defendant's points should have been answered separately. Jurors, being ordinarily unaccustomed to protracted consecutive thinking, are not likely to be able to carry so many points in their minds at once, and understand the effect of a single answer, at the close of their reading, affirming or denying them as a whole.

*Mr. A. W. Brungard*, District Attorney, and *Mr. T. C. Hipple*, for the commonwealth:

1. The offer to show Belford's condition of intoxication proposed a purely hypothetical case, and assumed as a basis a state of facts altogether disputed: See Nevling v. Commonwealth, 98 Pa. 326, 337. Its main purpose was to prove that the defendant was very susceptible to the influence of intoxicating liquors. This was not admissible: Nevling v. Commonwealth, supra; State v. Smith, 49 Conn. 376. How absurd, then, to attempt to prove that of Belford. The effect of liquor upon one person cannot be given in evidence to show its effect upon another. And, taken in its proper connection, the instruction as to good character which is assigned for error, did not withhold from the consideration of the jury any portion of the testimony on that subject. Immediately preceding it, the court told the jury to consider and weigh carefully all the evidence and give the prisoner the benefit of any reasonable doubt arising out of it, and, in the same sentence the concluding part of which is complained of, it was stated that good character was always of importance and to be considered. The language used admits of no such construction as the defendant's counsel put upon it, when taken in connection with the context. Hanney v. Commonwealth, 116 Pa. 322, and Heine v. Commonwealth, 91 Pa. 145, were cases of circumstantial evidence, and are so dissimilar to the present one, that they constitute no precedent to be followed: See Kilpatrick v. Commonwealth, 31 Pa. 204.

2. The charge of the court must be taken as a whole, and not in detached sentences, as in the second, third and sixth assignments of error: Penna. R. Co. v. Coon, 111 Pa. 430; Commonwealth v. Johnson, 133 Pa. 293; Rudy v. Commonwealth, 128 Pa. 507; Nevling v. Commonwealth, 98 Pa. 334; Kilpatrick v. Commonwealth, 31 Pa. 216; Reese v. Reese, 90 Pa. 93. The question as to the mental condition of the defendant was fully and unreservedly submitted to the jury, and it was their duty to determine what effect his drinking had upon his mind at the time of the killing, and whether there was an intent to take life, with a full and conscious knowledge of the purpose to do so: Wharton on Homicide, § 177; Commonwealth v. Daley, 2 Clark 368; Wharton & Stille, Med. Jur., § 216. Objection is made to the language used in the early decisions to the effect that "no time is too short" to frame a scheme of murder, etc. Considering the facts in the respective cases, it is obvious that this court did not convey in them the idea that there could be an instantaneous conceiving and planning of murder. In this case, however, the court below did not charge in the restricted language of the cases referred to, but submitted to the jury whether there was sufficient time to deliberate and premeditate, repeating the exact language used in Commonwealth v. Drum, 58 Pa. 16; Jones v. Commonwealth, 75 Pa. 407; Lanahan v. Commonwealth, 84 Pa. 89, and numerous other decisions.

3. The manner in which the fatal shot was fired, the manner and circumstances of the defendant's running away, his immediate, systematic attempt to escape, and his subsequent declarations as to events connected with his crime, demonstrate in the strongest possible manner his clearness of mind at the time of its commission, and exhibit the elements of murder of the first degree. Again; a feeling of animosity toward the deceased, expressed in threats made when he was not under the influence of liquor, is shown. If the sixth point of the defendant, which the court affirmed, was not in harmony with the general charge, any error committed in this respect was against the commonwealth and in favor of the prisoner. The court might very properly have refused that point: People v. Mills, 98 N. Y. 178. The instructions as to what constitutes the essence of murder of the first degree were in accordance with the estab-

lished interpretation: Commonwealth v. Drum, 58 Pa. 16; Sullivan v. Commonwealth, 93 Pa. 292; Lynch v. Commonwealth, 77 Pa. 207; Lanahan v. Commonwealth, 84 Pa. 89; Jones v. Commonwealth, 75 Pa. 406. The attempt to take life may be inferred from the nature of the weapon and the character of the wound: McClain v. Commonwealth, 110 Pa. 268; Commonwealth v. Drum, 58 Pa. 16. The testimony was fairly reviewed and its credibility properly submitted: McConkey v. Commonwealth, 101 Pa. 420; People v. Crowley, · 102 N. Y. 234.

OPINION, MR. CHIEF JUSTICE PAXSON:

But for a single error, this judgment might have been affirmed. The learned judge below instructed the jury, in his general charge, that "good character is always of importance and is evidence to be duly considered by the jury, and may turn the scale where there is a reasonable doubt as to the degree or grade of the crime." See second assignment. This is all the charge contains upon this subject; there was no point put to the court in regard to it. The fact that the homicide was committed by the appellant was not disputed below nor here, nor was there any attempt to show that the offence was manslaughter. The sole question was as to the degree of murder. The jury convicted appellant of murder in the first degree.

We think the evidence of good character is applicable both to the commission of the offence and the grade of the crime. So far, we are in accord with the trial judge. But we think he stated inaccurately the law as applicable to good character. In Heine v. Commonwealth, 91 Pa. 145, the court below instructed the jury: "If a man is guilty, his previous good character has nothing to do with the case, but if you have reasonable doubts as to his guilt, then character steps in, and aids in determining that doubt." This ruling was reversed by this court, Mr. Justice GORDON saying: "The effect of this was to give the evidence of good character no weight whatever; for, if the other testimony left in the minds of the jury a reasonable doubt of the defendant's guilt, this of itself, without more, entitled him to an acquittal. Evidence of good character is not a mere make-weight, thrown in to assist in the production of a result

that would happen at all events; but it is positive evidence, and may of itself, by the creation of a reasonable doubt, produce an acquittal:" citing Whart., Crim. Law, § 643.   In Hanney v. Commonwealth, 116 Pa. 323, the court below fell into the same error as in Heine v. Commonwealth, supra, and upon its review in this court the judgment was reversed, Justice GORDON repeating and amplifying his remarks in the former case.

It was urged, however, that Kilpatrick v. Commonwealth, 31 Pa. 198, sustains the ruling of the court below.   The portion of the charge assigned as error in that case is as follows: "The evidence proves the defendant to have borne an excellent reputation; originally, evidence of good character was not allowed to go to the jury, when there was positive proof of the commission of an offence, for if one was seen to commit a murder with deliberation, although he had borne an irreproachable character, and were even an angel, he would yet be guilty.   The rule of law in this state, however, permits evidence of good character to be submitted to the jury in every case of homicide, no matter what may be the other testimony in the cause.   But when a doubt suggests itself to your minds, as to the prisoner's guilt upon the facts of the case as presented by the evidence, the 'law casts the whole weight of the prisoner's former good character in mercy's scale, and settles the question in favor of the accused."   In commenting upon this language, this court said, through Mr. Justice STRONG: " The final exception is that the court erred in the instruction which they gave to the jury, respecting the evidence of the prisoner's good character. This, like the former, is based upon a misconception of the charge.   We do not understand the purport of the instruction to have been such as it is contended to have been by the counsel for the plaintiff in error.   The substance of the charge was that the law permitted evidence of good character to be submitted to the jury (of course for their consideration) in every case of homicide, no matter what might be the other testimony in the cause, and that, when a doubt arises as to the guilt of the accused, such doubt was conclusive in his favor.   This by no means confined the jury to attaching importance to the evidence only in cases of reasonable doubt.   On the contrary, it left them at liberty to make it a basis for the formation of a doubt."

I have been thus careful to quote the exact language of the court below and of this court in Kilpatrick v. Commonwealth, as I fear it has been misunderstood in some instances. The distinction between the two cases, briefly stated, is this: In the case in hand, the benefit of good character was limited to cases where there is a reasonable doubt of the guilt of the accused, or, in the precise language of the court below, " may turn the scale where there is a reasonable doubt as to the degree or grade of the crime;" while in Kilpatrick v. Commonwealth, the language of the court below, while not as explicit as in some of the later cases,—to repeat again the language of Justice STRONG,—"by no means confined the jury to attaching importance to the evidence only in cases of reasonable doubt. On the contrary, it left them at liberty to make it a basis for the formation of a doubt." There is nothing in the charge of the court below from which the jury could fairly infer that the evidence of good character might *create* the reasonable doubt which entitles the prisoner to a safe deliverance. It is true that the difference in phraseology in the two cases is apparently slight. There is, however, a real and substantial difference; and, where a man's life may depend upon a single word, the use of language cannot be attended with too much care.

We might cite numerous other cases upon this point, but the law is too well settled to require it. The rule deducible from the authorities may be briefly stated thus: Evidence of good character is always admissible for the defendant in a criminal case; it is to be weighed and considered in connection with all the other evidence in the cause,—it may of itself, in some instances, create the reasonable doubt which would entitle the accused to an acquittal. The rule itself is not merely merciful. It is both reasonable and just. There may be cases in which, owing to the peculiar circumstances in which a man is placed, evidence of good character may be all he can offer in answer to a charge of crime. Of what avail is a good character, which a man may have been a lifetime in acquiring, if it is to benefit him nothing in his hour of peril? The vice of this portion of the charge is in the instruction that good character " may turn the scale where there is a reasonable doubt as to the degree or grade of the crime." But, if the other evidence is such as to raise a reasonable doubt whether the grade of crime was mur-

der in the first degree, then the jury are bound to acquit of that offence; so that, as was observed in the cases cited, "this was to give the evidence of good character no weight whatever." The evidence of good character is to be considered with the other evidence in the case, and if it all combined creates a reasonable doubt, the defendant is entitled to an acquittal.

The learned judge below evidently was of opinion that the evidence of good character had little bearing upon the case. I gather this from his opinion refusing a new trial, in which he said, in commenting upon this portion of his charge: "Of this instruction the defendant has no cause of complaint. It was as favorable to him as he could ask. In fact, as the commission of the crime by the defendant was not disputed, and the only question for the jury to determine was the grade or degree of the crime, and as the determination of that question depended upon the mental condition of the defendant, whether intoxicated or not, we are of opinion that the evidence of the defendant's good character had little relevancy." We do not think the premises upon which this conclusion was drawn are entirely accurate. We do not understand that the commission of the crime was undisputed by the defendant. It is true the commission of the homicide was conceded, but not the commission of murder in the first degree. That was the crime for which he was on trial, and of which he was convicted. The commission of that offence was disputed below, and also in this court. Nor did the question of the degree depend alone "upon the mental condition of the defendant, whether intoxicated or not." The jury found that he was not intoxicated to the extent of preventing his forming the wilful, deliberate, and premeditated intent to take the life of the deceased. Just here is the place where the evidence of good character was entitled to come in, and have its due weight. Here was his supreme peril. The defence of intoxication had failed. If a man's good character is to avail him at all, when does he need it more than when a jury is deliberating upon the question whether he had formed in his mind the deliberate intent to take a human life? It might not have availed anything in this case; we are not considering the weight of the evidence upon this point, that was for the jury; but it should have been submitted to them is such manner as to give them a proper understanding as to how they should

Syllabus.

apply it. We cannot treat this as an immaterial matter which did not prejudice the defendant. It may not have done so, but we cannot say so. The issue of life and death is so vast, both as to this world and the next, that it is our duty to weigh every word carefully, and leave nothing to conjecture.

As the case must go back for another trial, it is proper to say that we do not discover any error in the remaining assignments. The testimony of Dr. Reese, referred to in the first assignment, was properly rejected. It was not competent to prove the defendant's intoxication by showing the condition of Belford, who was with him, and had taken the same number of drinks. Some men can drink twice as much as others without showing it. The inquiry would have involved a collateral issue which might have confused, if not misled, the jury. The remaining assignments refer to the charge. With the single exception above noted, we find no error in it.

Judgment reversed, and a venire facias de novo awarded.

