Commonwealth *v.* Farrow, Appellant.

Argued April 18, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and AR-NOLD, JJ.

*A. A. Guarino,* for appellant.

*Christopher F. Edley,* Assistant District Attorney, with him *Victor Wright,* Assistant District Attorney, and *Samuel Dash,* Acting District Attorney, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 23, 1955:

On June 4, 1943, David Farrow, having entered a general plea of guilty to murder, was adjudged guilty of that offense in the first degree by a Court composed

of McDevitt, P. J., Smith, P. J., and Flood, J., which fixed the penalty at life imprisonment. On August 4, 1954, Judge Levinthal following the granting of a writ of habeas corpus, vacated the 1943 judgment, reinstated the indictment and ordered a new trial. At the second trial, the defendant again pleaded guilty to murder, this time before a Court composed of Lewis, P. J., Carroll, J., and Sporkin, J., which also assessed the degree of murder at first degree and once more imposed a sentence of life imprisonment. The defendant has appealed to this Court from the judgment of sentence of the Court.

The story of the homicide in this case is as sordid as it is devoid of any moral principles in the realm of dignity and decency of life. On the night of February 5, 1943, the defendant took his "common law wife," Lillian Davis, to a secluded and darkened spot under a railroad trestle in the vicinity of Washington and 25th Streets, Philadelphia, stabbed her thirteen times and left her face downwards in the dirt. He returned to his home, wiped the blood from the knife he had used, went to bed and for five days feigned complete ignorance of the criminal venture. He was then apprehended by the police whereupon he voluntarily gave a statement in which he admitted his murderous deed.

The defendant and his victim had lived together from 1937 to 1940 in a meretricious relationship which had produced two children who became the subject of an oral altercation between them on the homicidal night of February 5, 1943. Visiting the home where the children resided, Farrow was informed by the landlady that the mother who was not there at the time had neglected the children and for a week had not washed their faces. From the children's home the defendant proceeded to a saloon called "The Point"

where he had a "couple of drinks." He then went to another taproom at 21st and Federal Streets where he found Lillian Davis drinking. He reproached her for her indifference to their offspring and then argued with her as he walked her to the fateful trestle where, according to his own words, he cut her "once across the throat, in the jaw and I don't know where else."

A careful review of the record conducts to the unhesitant conclusion that the learned judges in the Court below were amply warranted in finding the defendant guilty of murder in the first degree with the imposition of the penalty of life imprisonment.

The defendant admitted on three different occasions the salient features of the crime as above related. He argues on appeal, however, that the homicide which he committed did not rise higher than second degree murder because firstly he was in such a state of rage at the time of the killing that he was incapable of formulating the intent to take life, and, secondly, he was so intoxicated that he could not be held accountable for a mental purpose which it was impossible for him to generate.

As to the first point, the defendant contends that the very fact he stabbed thirteen times shows that he was seized with frenzy and consequently was unaware of what he was doing. This argument is so lacking in the cement of logic that it must crumble in midair and fall apart as almost meaningless words. It would be a strange principle of law indeed that would appraise responsibility for fatal stab wounds in inverse proportion to the number of sanguinary blows inflicted.[*] If this theory could apply to knife thrusts, it would equally have to apply to the use of firearms so that

[*] See *Com. v. Gelfi*, 282 Pa. 434; *Com. v. Eckerd*, 174 Pa. 137; *Com. v. Straesser*, 153 Pa. 451.

a murderer could quickly and easily remove his crime from the most serious category of homicide simply by continuing to pull the trigger of his deadly weapon until the discharging lead had wiped out the brand of first degree murder. Where insanity is not in the picture, the most rudimentary calculation demonstrates that a multiple hammering of lethal blows emphasizes rather than minimizes the murderous intent of the actor. Particularly must this be true where cold steel is wielded, because it takes a more malignant type of savagery to bury a blade into a human being where the murderer's hand itself becomes bathed in the victim's blood, than to stand at a distance and fire bullets; not, of course, that there is any less responsibility before the law because the less gory method is used.

Nor is there any evidence in the record to justify the defendant's assumption that he was suitably provoked into excessive wrath. He complains that his victim taunted him by saying that he was not the father of the children and that she also said: "The hell with the children." But the lofty indignation which the defendant assumes over the neglect of the children by Lillian Davis does not rest on any factual demonstration of any extraordinary devotion on his part to their welfare. But aside from the complete absence of any provocation which would unhinge moral and legal responsibility for his acts, the defendant had formulated a determination to strike down Lillian Davis even before she was supposed to have uttered the allegedly galling observations. A couple of hours before the killing he had talked to a woman by the name of Fannie Martin at the home of his children, and, accompanying his remarks with a significant display of his knife, he said to her: "If I find her tonight, I will cut her head off." That this resolve rode his thoughts until the grim moment that he had lured

Lillian Davis to a spot away from overseeing eyes is evidenced by the fact that once in the shadows beneath the railroad trestle he slashed her throat. He admitted that before he lifted the lethal blade she had done nothing: "Q. What took place right before you stabbed her? A. Nothing."

As far as the second defense is concerned, that of intoxication, there is nothing in the record to show that the defendant's reason had floated away on a sea of alcohol. In his confession he stated that he had had a "couple of drinks" at "The Point," but said nothing about drinking at the second taproom. When he testified at the first trial he repeated that he drank at "The Point," and added that he had a "couple drinks" with Lillian Davis at the second taproom. He also testified that "She reached down on the sidewalk and hit me with something, and I was drinking a little too much and I lost my head."

The confession, which the defendant made five days after the murder, clearly narrated the progress of events which led to the fatal stabbing. The degree of intoxication which would have absolved him from responsibility for the premeditated killing would have so drowned the tablets of memory that it would have been impossible for him to decipher from them all the intricate detail which he described in the confession and later corroborated at the trial.

At the second trial an attempt was made to bolster the theory of intoxication which, at the first trial, had had but slight underpinning of evidentiary support. Violetta Waters, the defendant's second "common law wife," testified that between 3 and 7 p.m. of the day of the murder the defendant and three others consumed "two-fifths" of whiskey, Farrow and another man drinking the larger portion. She said she saw Farrow drunk and staggering. Appraising this testi-

mony the lower Court said: "In the face of defendant's own confession and testimony concerning his drinking and movements, this story is incredible. We do not believe this witness." Other testimony of a similar character was presented. We cannot say that the Court abused its discretion in concluding that much of the evidence on intoxication revealed elements of self-inspiration which made it something less than trustworthy. At any rate, even if accepted at face value, it was not of such a character as to negative the facts of willful, deliberate and premeditated murder as presented and proved by the Commonwealth. We could well say here, as was said in the case of *Com. v. Kline*, 341 Pa. 238, 240: "Under the evidence as we have outlined it, we conclude, as did the Judges of the court below, that the alleged intoxication of defendant at the time of the commission of the crime was not such as to make him incapable of deliberating and premeditating upon his act. Intoxication which will negative plan and premeditation and the intent to kill must be such as to subvert conscious purpose: Com. v. Cleary, 135 Pa., 64, 19 A. 1017; Com. v. Detweiler, 229 Pa. 304, 78 A. 271; Com. v. Iacobino, 319 Pa. 65, 178 A. 823."

We see no trial error in the proceedings in the Court below. It is clear that the defendant was accorded every opportunity to show that his crime did not rise higher than second degree murder and that he failed in this attempt, and we are satisfied that the lower Court properly concluded that the evidence revealed beyond a reasonable doubt that the defendant was guilty of first degree murder.

The judgment of sentence is, therefore,

Affirmed.