642 A.2d 490

**COMMONWEALTH of Pennsylvania**

v.

**Anong KHAMPHOUSEANE, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 10, 1994.

Filed March 21, 1994.

Reargument Denied May 26, 1994.

Petition for Allowance of Appeal Denied Sept. 15, 1994.

Clifford B. Cohn, Philadelphia, for appellant.

Kathy L. Echternach, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before WIEAND, OLSZEWSKI and HOFFMAN, JJ.

WIEAND, Judge.

Anong Khamphouseane was tried by jury and was found guilty of rape, statutory rape and corruption of a minor. Post-trial motions were denied, and Khamphouseane was sentenced to serve concurrent terms of imprisonment for not less than five (5) years nor more than ten (10) years for rape and not less than two and one-half (2½) years nor more than five (5) years for corruption of a minor. On direct appeal from the judgment of sentence, Khamphouseane asserts that the trial court erred by permitting the Commonwealth to introduce evidence of Human Leukocyte Antigen (HLA) blood tests without laying an adequate foundation therefor. Appellant also contends that his trial counsel was ineffective for failing to object to an erroneous jury charge regarding character evidence and for failing to object to the trial court's inadequate attempt to give curative instructions relative to an improper comment by the prosecuting attorney which highlighted appellant's failure to testify. We will consider these issues seriatim.

The factual scenario which led to appellant's convictions was summarized in the opinion of the trial court as follows:

The Complainant, Phimpha Bandith, was born on June 10, 1977 in the country of Laos. She moved to Philadelphia with her mother, brother and two sisters at the age of nine. She and her family resided with the Defendant (her uncle) and his family on Ormes Street in Philadelphia. On several occasions in 1989 and in 1990 the Defendant sexually assaulted the Complainant, who was then under the age of fourteen.

The first incident occurred when the Complainant, while sleeping in her bedroom, was awakened by the Defendant

who entered her room and jumped on top of her. He removed her shirt and began to kiss her chest and touch her stomach. She told him to: "Stop, it's not the right thing to do". The Defendant threatened her by stating: "If [you] tell anybody [I] will kill [your] whole family".

On another occasion in 1989, which also occurred at the Ormes Street residence, the Defendant hit the Complainant and placed a 12 inch knife to her throat. He forced the Complainant upstairs, removed her clothes and forced her to have sexual intercourse with him. Again the Defendant threatened the Complainant stating: "If you tell anybody else, I will kill your whole family". Similar sexual assaults continued at the Ormes Street residence and even later when the Complainant moved, with her family, from the Defendant's house to Rosehill Street in 1990.

It was not until the Complainant became pregnant that she reported the incidents to the Police. No one other than the Defendant ever had sexual intercourse with the Complainant.

At trial, the Commonwealth called as an expert witness Dr. Berta Huggins, the director of the laboratory at Genetic Design Inc., a paternity testing laboratory located in Greensboro, North Carolina. Dr. Huggins testified regarding the results of HLA testing done on blood samples provided by appellant, the victim and the child who was born to the victim. The results of the testing disclosed that appellant could not be excluded as the father of the victim's child and that he was 8,754 times more likely to be the child's father than any other random Oriental man who was unrelated to appellant. Appellant contends, however, that the results of the HLA testing should have been excluded because the Commonwealth failed to lay a proper foundation to support their admission.

"In Pennsylvania, '[t]he admissibility of any experimental or scientific evidence depends upon presenting an adequate foundation.'" *Commonwealth v. Miller*, 367 Pa.Super. 359, 363, 532 A.2d 1186, 1188 (1987), quoting *Commonwealth v. McGinnis*, 511 Pa. 520, 524, 515 A.2d 847, 849 (1986). Thus, in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), the

Pennsylvania Supreme Court held that the admissibility of scientific evidence "depends upon the *general* acceptance of its validity by those scientists active in the field to which the evidence belongs." *Id.* at 231, 369 A.2d at 1281. See: *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923). See also: *Commonwealth v. Zook,* 532 Pa. 79, 98–99, 615 A.2d 1, 11 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993).

HLA testing "involves tissue typing of white cell blood groups." *Turek v. Hardy,* 312 Pa.Super. 158, 160, 458 A.2d 562, 563 (1983). The results of this testing can conclusively exclude one's paternity of a child and may also "be used to calculate the probability that a putative father is the actual father." *Id.* at 160–161, 458 A.2d at 563. The process has been more fully explained as follows:

'. . . The exclusion procedure comprises the identification of certain genetic markers in the blood of the mother, child, and putative father; followed by the application of "Mendelian rules of inheritance" to determine whether it would be genetically impossible for the accused to be the biological father. An exclusion may occur in two ways. First, the child may possess a genetic characteristic which had to have come from someone other than the defendant. Second, the child may lack a genetic marker that he would have to possess if the accused were the father. In either of these situations, the defendant is conclusively proved innocent without any statistical estimations. In many cases, the possibility of exclusion may approach 99% when several genetic marker systems are used. The credibility of the exclusion method is beyond reproach in the scientific community, and most courts will accept results indicating nonpaternity as conclusive proof.

. . . Basically, the inclusion procedure commences where the exclusion procedure terminates. In other words, when the typing stage (the method described above as the "exclusion method") fails to exclude the accused, a statistical estimation of his "likelihood of paternity" is calculated. This calculation entails the use of a probability formula

known as the "Essen–Moller" version of the "Bayes' Theorem."  A simplified version of this formula may be summarized as follows:  The ratio of the likelihood that the accused contributed certain genetic characteristics identified in the child, to the likelihood that one other "random man" contributed them.  The "random man" variable is derived from the estimated frequencies of the particular characteristics in the relevant population.  The ratio yielded by the Bayes' formula, called the "paternity index," is converted into a percentage value, "the likelihood of paternity," which is then presented to the trier of facts.'

*Olson v. Dietz,* 347 Pa.Super. 1, 4–5, 500 A.2d 125, 126–127 (1985), quoting Case Comment, *Human Leukocyte Antigen Test Results Are Admissible in Paternity Cases to Show the Likelihood of Paternity, Turek v. Hardy,* 312 Pa.Super. 158, 458 A.2d 562 (1983), 88 Dick.L.Rev. 565, 567–569 (1984) (footnotes omitted).

In *Turek v. Hardy, supra,* the Superior Court, after concluding that HLA testing is generally accepted in the scientific community as reliable, held that the results of such testing are relevant and admissible as "some evidence of paternity."  *Id.* at 161–163, 458 A.2d at 564–565.  However, "HLA blood tests are not conclusive evidence of paternity."  *Smith v. Shaffer,* 511 Pa. 421, 427, 515 A.2d 527, 529 (1986).  See also: *Stahli v. Wittman,* 412 Pa.Super. 281, 287–288, 603 A.2d 583, 586 (1992); *Connell v. Connell,* 329 Pa.Super. 1, 7, 477 A.2d 872, 875 (1984).  Moreover, before the results of HLA testing may be admitted into evidence, a proper foundation must be laid.  See: *Jones v. Trojak,* 402 Pa.Super. 61, 70, 586 A.2d 397, 401 (1990), *aff'd,* 535 Pa. 96, 634 A.2d 201 (1993); *Turek v. Hardy, supra* at 164, 458 A.2d at 565.  In this regard, the Superior Court has observed:

The party seeking to affirmatively use the HLA results should show:

1.  the effect of racial and ethnic variables

2.  any factors which might invalidate the test or affect its accuracy (for example, the AMA–ABA Guidelines indi-

cate that HLA results are most reliable when the test is conducted in conjunction with other blood group tests.)

3. The procedures of the actual test.

4. The qualifications of witnesses.

Of course, the foundation laid must suit each case and we do not consider these guidelines exhaustive. Furthermore, our holding that these test results are admissible is without prejudice to a defendant's right to challenge the reliability of the results and test methods in an individual case.

*Turek v. Hardy, supra.* See also: *Jones v. Trojak, supra,* 402 Pa.Super. at 70–71, 586 A.2d at 401.

Appellant contends that the Commonwealth failed to explain adequately the racial and ethnic variables as they related to his specific ethnic background. More specifically, appellant argues, the results of HLA testing in this case were of doubtful accuracy because the Gene Frequency Tables utilized by Dr. Huggins were based upon a population of Japanese and Chinese Americans and not upon a population of Laotians. Dr. Huggins' conclusions regarding the likelihood of his paternity of the victim's child, appellant contends, were based upon a comparison with the random Oriental man and not the random Laotian man.

After careful review, we are satisfied that an adequate foundation was laid regarding the effect of racial and ethnic variables upon the results of HLA blood testing. In this regard, Dr. Huggins testified as follows:

Q. Now, I notice that there is a paternity index figure next to each of the systems that were tested here. Would you explain for the jury what that is, please?

A. Yes. The paternity index is a term that indicates a genetic odds. It tells us how many times more likely this man, the alleged father, to be the true father of the child than would be another untested random man of the same ethnic background.

Based on each of those fourteen tests and the fact that he is not excluded by any of those tests, the paternity index for each is then multiplied together to give us a combined

paternity index telling us what all fourteen tests tell us how rare are these fourteen systems that they are sharing markers and found, in this particular case, an Oriental population.

Q. And would you explain the basis of your calculations? When you say in the Oriental population or the Asian population, tell us how you calculate these genetic markers?

A. The paternity index is calculated with a simple equasion [sic] of X over Y, with X being the ability of the alleged father to give the necessary genetic marker to the child, divided by Y, the ability of the random man to give the genetic marker.

Now, in order to calculate these figures, we have to use something called gene frequency tables, and these are tables in which a large number of individuals' blood has been analyzed, and each of these different markers have been identified in that population to allow us to be able to say how frequently do we find type b blood in the Caucasian population.

How frequently do we find a particular HLA marker in the black population. How frequently can we find an ACP marker in the Oriental population.

Those gene frequency tables are utilized for the calculation of paternity index.

Q. Now, you said that you used that for the Asian population. And how many people are sampled, and what is the basis of that?

A. For this particular test using the Oriental population as our base for the red blood cells surface markers and the internal red cell markers and serum protiens [sic], that number is greater than 1600 individuals.

For the HLA A and B marker, the number of individuals tested was 693, I believe.

Q. And this gene frequency tables, who puts those together?

A. The gene frequency tables are compiled by various laboratories across the country, and then submitted to the

American Association of Blood Banks to provide to their accredited organizations.

Q. And these gene frequency tables, they're accepted for use in what areas?

A. They're accepted for use in bone marrow transplantation. They are accepted for use in paternity testing.

On cross-examination, appellant was permitted wide latitude in exploring the specific racial and ethnic variables relative to the HLA testing in the instant case. These factors were addressed by Dr. Huggins, on re-direct examination, in the following manner:

Q. Now, you were asked about testing from the Oriental group versus a Laotian group. Do you have any statistics from just the Laotian group?

A. No; I was only able to find gene frequencies for five of the systems for Laotians. I was also able to find frequencies for six of the systems for Cambodians and for Vietnamese. There were no known published frequencies for HLA systems or for any of the other—or any of the electric baretta systems.

These are all red blood cell systems that I was able to find a few frequencies based on a small sampling of individuals.

Q. Now, how much—how many tests does that cover of the tests that you did in this case?

A. For the Laotian frequency, again, there were five tests in which I was able to locate some gene frequencies. Those were the ABO, RH, MNSS, Kell, and Duffy systems.

Q. And how about for the other groups?

A. For the Cambodian and Vietnamese frequencies, it was those same five plus the Kidd system. It's the red blood cell surface markers.

Q. And would you explain to us what the difference is between the Laotian group and the Asians group?

A. The Laotian calculation, based on utilizing results of the five tests, using Laotian gene frequencies and then utilizing

the results from the rest of this test from the Oriental population yielded a paternity index of 8,608 to one.

Q. And what was the one as to the Asian group that you calculated originally?

A. 8,754 to one.

Q. And the one that is less than 8,754, that is just the Laotian group?

A. Just for five of the systems. That's the only frequencies that were available. The rest are the same systems, the same paternity index as is on the Asian report.

Q. Now, you said that it was highly unlikely, in answer to counsel's question, that a boyfriend of the mother might be the father. Would you explain why?

A. Because of the fact that the genetic marker of the child and alleged father are sharing are rare and indicate a high combined paternity index of 8,754 to one, the likelihood of a unrelated individual of the alleged father being the biological father is very small.

If the alleged father, however, had a relative, if his first-degree relative had access to the mother during the conceptive period, that likelihood that he might be the father of the child would be more likely than a random man, though still improbable.

Q. You said a first-degree relative; what do you mean by that?

A. A first-degree relatives are considered to be brothers, or fathers and sons.

Q. So, in other words, that would have to be someone who is a blood relative of Mr. Khamphouseane?

A. That's correct.

Review of the record discloses that the jury was fully apprised of the effect of racial and ethnic variables upon HLA blood testing in general, and also of the specific racial and ethnic variables upon which the testing in the instant case was based. We hold, therefore, that a proper foundation for admission of the HLA test results was established. That the probability of appellant's paternity of the victim's child was

calculated in relation to a population of random Oriental men, rather than a population of random Laotian men, may have been a factor affecting the weight to be placed by the jury upon the test results, but it did not destroy the admissibility of the test results.[1] It did not destroy admissibility of the test results any more than in cases of white males, which, of necessity include English, Polish, German, French, Italian etc. males. The trial court did not err, therefore, when it permitted Dr. Huggins to testify concerning the probability that appellant was the father of the victim's child.

"Because the law presumes that counsel is effective, the burden of establishing ineffectiveness rests with appellant." *Commonwealth v. House,* 371 Pa.Super. 23, 28, 537 A.2d 361, 363 (1988). The standard used to evaluate claims of ineffective assistance of counsel has been stated by the Pennsylvania Supreme Court in the following manner:

> The threshold inquiry in such claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim. *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985). If this threshold is met, it must next be established that the particular course chosen by counsel had no reasonable basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Finally, we require that the defendant establish how coun-

1. With respect to the testimony of Dr. Huggins, the trial court specifically charged the jury as follows:

> Now, regarding the expert testimony of Doctor Huggins, in deciding whether to accept the witness' opinion, you must consider the racial and ethnic variables in the blood testing procedure referred to, and that was referred to as HLA testing.

> Also, remember that said tests cannot as a matter of law determine conclusively or absolutely that the defendant or any other person is the father of the child born to Phimpha Bandith.

> Also, that that particular testimony is only a part of all of the evidence you should consider and not the only evidence you should consider.

sel's commission or omission prejudiced him. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

*Commonwealth v. Durst*, 522 Pa. 2, 4–5, 559 A.2d 504, 505 (1989). "To establish prejudice under this standard 'requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Commonwealth v. Carter*, 409 Pa.Super. 184, 187–188, 597 A.2d 1156, 1157 (1991), quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Moreover,

> "[b]efore a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). We inquire whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect defendant's interests. See *Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973). Thus, counsel's assistance is deemed constitutionally effective once we are able to conclude the particular course chosen by counsel had some reasonable basis designated to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604, 235 A.2d 349 (1967).

*Commonwealth v. Dunbar*, 503 Pa. 590, 596, 470 A.2d 74, 77 (1983).

At trial, appellant presented witnesses who testified that he enjoyed a good reputation for being a truthful, law abiding and peaceful person. With respect to this testimony, the trial court instructed the jury as follows:

> Now, the defense offered evidence tending to prove that the defendant is a person of good character and reputation. I am speaking of the defense witnesses who testified about the defendant's good reputation for honesty, truthfulness, being a law-abiding person.

The law recognizes that a person of good character is not likely to commit a crime which is contrary to his nature. Evidence of good character may by itself raise a reasonable doubt of guilt and justify a verdict of not guilty.

You must weigh and consider the evidence of good character along with the other evidence in the case. If on all the evidence, you have a reasonable doubt as to the defendant's guilt, you must find him not guilty.

However, if on all the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty, you should find him guilty.

Appellant argues that this instruction was erroneous and that his trial counsel was ineffective for failing to object thereto.

In *Commonwealth v. Neely*, 522 Pa. 236, 561 A.2d 1 (1989), the Supreme Court held that a defendant is entitled to a jury charge that evidence of good character may, in and of itself, create a reasonable doubt. Appellant concedes that the language required by *Neely* was employed by the trial court in the instant case. However, he contends that by subsequently instructing the jury that character evidence is to be weighed along with the other evidence in the case, the trial court diluted the effect of the charge mandated by *Neely*. Appellant asserts that, pursuant to *Neely*, character evidence must by viewed apart from the other evidence and may not be weighed by the jury against such other evidence. We disagree.

The law in Pennsylvania with respect to evidence of a criminal defendant's good character was announced by the Supreme Court in *Commonwealth v. Cleary*, 135 Pa. 64, 19 A. 1017 (1890), as follows:

Evidence of good character is always admissible for the defendant in a criminal case; *it is to be weighed and considered in connection with all the other evidence in the cause,*—it may of itself, in some instances, create the reasonable doubt which would entitle the accused to an acquittal. The rule itself is not merely merciful. It is both reasonable and just. There may be cases in which, owing to

the peculiar circumstances in which a man is placed, evidence of good character may be all he can offer in answer to a charge of crime. Of what avail is a good character, which a man may have been a lifetime in acquiring, if it is to benefit him nothing in his hour of peril?

*Id.* at 84, 19 A. at 1018 (emphasis added). With its decision in *Commonwealth v. Neely, supra*, nearly a century later, the Supreme Court did not undertake to change the substantive law regarding evidence of a defendant's good character. Rather, the Court set out to ensure that the defendant received the benefit of a jury instruction consistent with the law announced in *Cleary*.

In the instant case, appellant had the benefit of a jury instruction which fully and correctly apprised the jury of the manner in which it could consider appellant's evidence of good character. The trial court's charge quoted almost verbatim from the Pennsylvania Suggested Standard Jury Instruction.[2] The court's charge was also consistent with the decisions of both the Supreme and Superior Courts which have examined jury instructions given with respect to evidence of good character. See: *Commonwealth v. Holland*, 480 Pa. 202, 219–220, 389 A.2d 1026, 1034 (1978); *Commonwealth v. Stoner*, 265 Pa. 139, 108 A. 624 (1919); *Commonwealth v. Hernandez*, 404 Pa.Super. 151, 163–165, 590 A.2d 325, 331 (1991). Because

2. Pennsylvania Suggested Standard Jury Instruction (Criminal) 3.06 provides, in pertinent part, as follows:

(1) The defense offered evidence tending to prove that the defendant is a person of good character. I am speaking of the defense witnesses who testified about the defendant's good reputation for (honesty) (truthfulness) (sexual morality) (peaceableness) (being a law-abiding person) ( ).

. . . .

(3) The law recognizes that a person of good character is not likely to commit a crime which is contrary to his nature. Evidence of good character may by itself raise a reasonable doubt of guilt and justify a verdict of not guilty.

(4) You must weigh and consider the evidence of good character along with the other evidence in the case. If on all the evidence you have a reasonable doubt of the defendant's guilt you must find him not guilty. However, if on all the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty you should find him guilty.

appellant received the benefit of a proper jury instruction with regard to his evidence of good character, his trial counsel will not be deemed ineffective for failing to make a meritless objection thereto.

■ During his opening statement to the jury, defense counsel said that appellant would testify at trial and that the jury would hear his side of the story. Appellant, however, did not testify at trial. In closing argument, the prosecuting attorney commented as follows:

And counsel in his opening tells you a lot of things about what this case is about. He also told you a lot of things in his opening about who was going to testify. And promises he made to you, and that you would hear his side of the story of what happened.

You heard the defendant's wife yesterday, and after that, you heard no one else.

After a defense objection, it was agreed that a cautionary instruction would be given by the trial court in response to the prosecutor's comment regarding appellant's failure to testify on his own behalf. In this regard, the trial court instructed the jury as follows:

And lastly, you are instructed, also, that a defendant may plan to take the stand and testify initially, but may change his mind during the course of the trial, and that decision may be based on a variety of reasons. And I will instruct you further in that regard. All right?

Thereafter, in its general charge to the jury, the trial court gave additional instructions as follows:

Furthermore, a defendant is presumed to remain innocent from the time of arrest and throughout the trial unless and until you conclude, based upon careful and impartial consideration of the evidence, that the Commonwealth has proven the defendant guilty beyond a reasonable doubt.

It is not the defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of each of the

crimes charged, and that the defendant is guilty of any of those crimes beyond a reasonable doubt.

A person accused of a crime is not required to present evidence, or to prove, or say anything whatsoever in their own defense. If the Commonwealth's evidence fails to meet its burden, then the verdict must be not guilty.

When, at the conclusion of the jury charge, the trial court asked if counsel had anything further, appellant's trial counsel replied that he had no objections to the court's charge.

Appellant now argues that his trial counsel was ineffective for failing to object to the absence of an explicit instruction that no adverse inference could be drawn from his failure to testify at trial. The Commonwealth asserts that no such instruction was necessary because the prosecuting attorney's reference to appellant's failure to testify was a fair response to arguments which had been made by defense counsel. The Commonwealth further suggests that the cautionary instructions provided by the trial court, along with those contained in its general jury charge, were sufficient to cure any prejudice which may have resulted from the prosecutor's reference to appellant's not testifying at trial. Finally, the Commonwealth suggests that appellant's counsel may, as a matter of strategy, have decided not to request a "no adverse inference" instruction in order to avoid calling any further attention to appellant's failure to testify at trial.

Pursuant to both the Fifth Amendment to the United States Constitution and Article I, Section 9, of the Pennsylvania Constitution, a criminal defendant is entitled to receive, upon timely request, a specific instruction which informs the jury that it may draw no adverse inference from the fact that the defendant did not testify at trial. *Carter v. Kentucky,* 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981); *Commonwealth v. Lewis,* 528 Pa. 440, 598 A.2d 975 (1991). See: Pennsylvania Suggested Standard Jury Instructions (Criminal) 3.10A. The availability of such an instruction does not depend upon whether or not the prosecution has made a

reference to the accused's failure to testify.[3] In addition, the Pennsylvania Supreme Court has held that the explicit "no adverse inference" instruction may not be adequately replaced by general instructions which inform a jury that the defendant has no duty to testify on his own behalf. In this regard, the Court reasoned as follows:

> The specific constitutionally mandated "no-adverse-inference" charge may not be replaced by a patchwork of less direct instructions. The entire premise underlying our requirement of the "no-adverse-inference" charge to the jury, under Article I, Section 9, is that the trial judge is vested with an obligation to protect the defendant's right to remain silent, free from the insidious danger of adverse inference presented by a jury left free to wander in speculation. Experience teaches us that the very exercise of an individual's right not to testify, under Article I, Section 9, may endanger that right if the jury is left free to draw negative inferences from the defendant's decision to exercise his or her constitutional privilege. The trial court, being in a unique position to protect a defendant's constitutionally secured right through the jury charge, is the only bulwark to ensure that the exercise of a fundamental right does not turn into an act of constitutional suicide. Having determined in this Commonwealth that a "no-adverse-inference" charge is necessary to secure the guarantees of Article I, Section 9, the judge has either given the charge or he has not. Make-shift substitutes will not suffice. Juries must be told in no uncertain terms that no adverse inference may be drawn from a defendant's failure to take the stand; otherwise, we are left to mere guesswork as to the meaning juries have ascribed to tangentially related words of the court.

*Commonwealth v. Lewis, supra* at 450, 598 A.2d at 980 (footnote omitted).

In the instant case, appellant would clearly have been entitled to a "no adverse inference" instruction. No such

---

**3.** We need not decide, therefore, whether the prosecuting attorney's reference to appellant's failure to testify was improper.

instruction, however, was requested by trial counsel, even after the prosecuting attorney, in his closing argument, called direct attention to the fact that appellant had not testified at trial. We are constrained to conclude, therefore, that there is arguable merit in appellant's contention that his trial counsel was ineffective for failing to request, or to object to the absence of, a "no adverse inference" instruction in the trial court's charge to the jury. Because no hearing has been held, however, we do not know the reason for counsel's failure to request such an instruction. The Supreme Court has recognized "that, for strategical reasons, a defendant and his or her counsel may determine that defendant's right to remain silent under Article I, Section 9, is best served by requesting that a 'no-adverse-inference' charge *not* be given to the jury, in order to avoid drawing attention to defendant's failure to testify." *Commonwealth v. Lewis, supra* at 455 n. 14, 598 A.2d at 983 n. 14.[4]

" 'When an arguable claim of ineffective assistance of counsel has been made, and there has been no evidentiary hearing in the [trial court] to permit the defendant to develop evidence on the record to support the claim, and to provide the Commonwealth an opportunity to rebut the claim, this Court will remand for such a hearing.' " *Commonwealth v. McBride,* 391 Pa.Super. 113, 121, 570 A.2d 539, 543 (1990), quoting *Commonwealth v. Petras,* 368 Pa.Super. 372, 377, 534 A.2d 483, 485 (1987). Instantly, there also is a need for an evidentiary hearing to establish whether the failure by counsel to object to the absence of a "no adverse inference" instruction was the result of a strategic decision on counsel's part or merely the result of sloth or ignorance of available alternatives. See: *Commonwealth v. Collins,* 519 Pa. 58, 65, 545 A.2d 882, 886 (1988); *Commonwealth v. Mickens,* 409 Pa.Super. 266, 280, 597 A.2d 1196, 1203 (1991). If, after an evidentiary hearing, it is determined that counsel was ineffective, a

4. Indeed, the Supreme Court has recently held that it is *"per se* reversible error if a judge instructs the jury concerning a defendant's right not to testify when the defendant has requested that no such instruction be given." *Commonwealth v. Edwards* 535 Pa. 576, 579, 637 A.2d 259, 261 (1993).

new trial must be granted. If, however, it is determined that counsel was not ineffective, the judgment of sentence may be reimposed.

The judgment of sentence is vacated, at least for the time being, and the case is remanded for an evidentiary hearing consistent with the foregoing opinion.

Jurisdiction is not Retained.