**Checchio v. Frankford Hospital
(Torresdale Division)**

144

*Glenn C. McCarthy,* for plaintiffs.
*Edward C. Mintzer,* and *Peter J. Hoffman,* for defendants.

BONAVITACOLA, *P.J.,* January 8, 1998—This medical malpractice action is on appeal by plaintiffs, Daniel Checchio, by and through his parents and natural guardians, J. Michael Checchio and Patricia Checchio, who claim that this court erred when, on July 31, 1997, it granted Frankford Hospital—Torresdale Division, Edwin R. Concors M.D. and Michael Malen M.D., defendants, joint motion for summary judgment.

## PROCEDURAL HISTORY

The underlying cause of action was commenced on June 2, 1989, by writ of summons. A complaint in civil action was thereafter filed by plaintiffs on October 12, 1989 wherein they averred, inter alia, that on or about February 17, 1984, minor plaintiff, Daniel Checchio, suffered severe and permanent brain damage as a result of negligent neonatal medical care and treatment rendered to him by defendants, Frankford Hospital—Torresdale Division, Children's Hospital of Philadelphia, Marvin Kalafer M.D., Carl H. Kennedy Jr. M.D., Edwin R. Concors M.D., Michael Malen M.D., and Andrew Eisen M.D.

As a result of preliminary objections filed by defendant, Edwin R. Concors M.D., the plaintiffs on December 8, 1989 filed an amended complaint pursuant to Pa.R.C.P. 1028(c)(1).

The defendants thereafter denied plaintiffs' averments and interposed defenses. In addition, various cross-claims were filed by defendants pursuant to Pa.R.C.P. 2252.

The parties engaged in extensive discovery and on March 9, 1994, a stipulation was entered into between plaintiffs and all of the defendants voluntarily dismissing Children's Hospital of Philadelphia, Dr. Andrew Eisen M.D. and Philip Roth M.D., an additional defendant, from this cause of action. The parties also entered into a separate stipulation and agreement on March 25, 1994 dismissing defendants, Marvin Kalafer Jr. M.D. and Carl H. Kennedy M.D., from the underlying action.

Subsequently, this case was assigned with the consent of all parties for trial to Charles B. Burr II, Esquire, as a judge pro tempore in accordance with the court's inventory delay reduction program.

Thereafter, the remaining defendants, in anticipation of trial, filed a joint motion in limine for judicial determination of the admissibility of scientific/medical testimony.

Judge Pro Tempore Burr, after consideration of the motion in limine, and in an attempt to minimize delay at the time of trial, directed defendants to depose plaintiffs' expert witnesses regarding the foundation and substance of their proffered expert testimony as set forth in their expert reports and/or answers to expert interrogatories.

Following the depositions of plaintiffs' expert witnesses and the completion of pretrial discovery, defendants filed a joint motion for summary judgment asserting, inter alia, that plaintiffs failed to proffer expert testimony on the issue of causation which would meet the standard of admissibility of scientific expert testimony as set forth in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013, 1014 (1923): "general acceptance of reliability in the relevant scientific community," as adopted by the Pennsylvania Supreme Court in *Commonwealth v. Topa,* 471 Pa. 223, 231, 369 A.2d 1277,

1281 (1977). Plaintiffs in turn filed a timely response thereto asserting that since their experts are deemed qualified in their respective medical fields, their testimony at the time of trial on the issue of causation requires a determination of credibility by the jury and thus summary judgment is barred under the doctrine set forth in *Nanty-Glo Borough v. American Surety Co.,* 309 Pa. 236, 163 A. 523 (1932) and its progeny. On July 23, 1997, oral argument on the motion for summary judgment was held jointly before President Judge Bonavitacola and Judge Pro Tempore Burr. The court on July 31, 1997, granted summary judgment in favor of the remaining defendants. It is this order which forms the genesis of the within appeal.

## STANDARD OF REVIEW

Pennsylvania Rule of Civil Procedure 1035.2 governs the standard of review in determining a motion granting summary judgment and states, in pertinent part: "[a]fter the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

"(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury."

In resolving a motion for summary judgment, the court must examine the record in the light most favorable

to the non-moving party and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State University v. County of Centre,* 532 Pa. 142, 615 A.2d 303 (1992); *Washington Federal Savings and Loan Association v. Stein,* 357 Pa. Super. 286, 515 A.2d 980 (1986). Summary judgment will be granted only in those cases which are free and clear from doubt. *State Farm Mutual Automobile Insurance Co. v. Universal Underwriters Insurance Co.,* 441 Pa. Super. 446, 657 A.2d 1252 (1995), *appeal granted,* 544 Pa. 613, 674 A.2d 1075 (1996).

## DISCUSSION

Considering this case in light of the foregoing principles, the record discloses the following facts: The minor plaintiff was born on February 17, 1984 at Frankford Hospital—Torresdale Division by way of caesarian section at approximately 36 weeks gestation. Shortly after birth it was discovered that the minor plaintiff suffered from hyaline membrane disease otherwise called respiratory distress syndrome (RDS). His short post-natal care at Frankford Hospital—Torresdale Division was marked by respiratory difficulties resulting from RDS which required supplemental oxygen to be provided by oxygenhood. In the early hours of February 18, 1984, minor plaintiff was required to be intubated to assist in breathing and was then transferred to Children's Hospital of Philadelphia (CHOP) where he was eventually placed on a ventilator. The minor plaintiff was discharged from CHOP on March 2, 1984, with a discharge diagnosis of preemie grower status, post-respiratory distress syndrome.

Subsequently, two years after birth, the minor plaintiff was diagnosed with pervasive developmental disorder, autism, and mental retardation. The minor plaintiff has

asserted that defendants negligently managed his RDS and that this mismanagement resulted in his developing neonatal hypoxia which is the proximate cause of his permanent neurological dysfunction.

Defendants, on the other hand, are not contesting the facts as presented herein but have alleged that plaintiffs have failed to legally establish through proffered expert evidence a causal relationship between neonatal hypoxia and autism and/or pervasive developmental disorder with or without mental retardation.[1]

The issue of whether scientific testimony concerning causation is admissible involves consideration of two determinative evidentiary questions: (1) does the expert testimony of plaintiffs' witnesses on the issue of causation meet the *Frye* "general acceptance of reliability in the relevant scientific community" test or (2) are Pennsylvania common-law rules regarding the foundation of expert testimony on causation substantially similar to the more liberal standards applied by the Federal Rules of Evidence and the United States Supreme Court in the case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Although our Supreme Court in the case of *Commonwealth v. Crews,* 536 Pa. 508, 518-19 n.2, 640 A.2d 395, 400 n.2 (1994) "left to another day" whether the rationale of *Daubert* will supersede or modify the

---

1. To state a prima facie cause of action for medical malpractice, a plaintiff must establish through expert testimony that "(1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of duty was the proximate cause of, or a substantial factor in bringing about, the harm suffered by the patient, and (4) the damages suffered by the patient were a direct result of that harm." *Eaddy v. Hamaty,* 694 A.2d 639, 642 (Pa. Super. 1997); also see, *Mitzelfelt v. Kamrin,* 526 Pa. 54, 62, 584 A.2d 888, 891 (1990).

*Frye* test in Pennsylvania, we have applied the standards set forth *in Daubert* to the case at bar. These standards are more favorable to the plaintiffs than any other litmus test.[2]

In *Daubert,* the United States Supreme Court was "called upon to determine the standard for admitting expert scientific testimony in a federal trial." *Id.,* 113 S.Ct. at 2791. Construing Federal Rule of Evidence 702, the court held that the *Frye* standard—general acceptance of reliability in the relevant scientific community—was superseded by the adoption of the Federal Rules of Evidence. *Id.,* 113 S.Ct. at 2793.

*Daubert* relaxes, somewhat, the impediments to admission of novel scientific evidence. Under *Daubert,* expert scientific testimony is admissible if it fulfills two criteria. First, it must relate to "scientific knowledge," thereby establishing a standard of evidentiary reliability, which will be based upon scientific validity. To constitute scientific knowledge, the evidence must be grounded in the methods and procedures of science, based on more than subjective belief or unsupported speculation, and supported by appropriate validation based on what is known. The second criterion is that the evidence must be relevant; it must assist the trier of fact to understand the evidence or to determine a fact in issue. *Id.,* 113 S.Ct. at 2794-95. "General acceptance will no longer, in federal trials, constitute a threshold necessity in determining admissibility of scientific evidence, though it remains a factor to consider in determining admissibility. Other factors are whether the technique or methodology can be or has been tested:

---

2. It logically follows that if certain expert testimony is inadmissible under *Daubert,* it would, by its very nature, be inadmissible under the more restrictive *Frye* test.

its 'falsifiability, or refutability, or testability.' Another consideration is whether the theory or technique has been subjected to peer review and publication. A court should also consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation." *Id.*, 113 S.Ct. at 2797.

In an attempt to establish the proximate cause of minor plaintiff's neurological dysfunction, plaintiffs proffered the expert neurological testimony of Ralph J. Wynn M.D. and Leon I. Charash M.D., which we will discuss herein in detail. In addition to plaintiffs' proffered testimony, we have reviewed the deposition testimony of Leonard Graziani M.D., Robert Stavis M.D., David Behar M.D., Hope Punnett Ph.D., Joyce Mauk M.D. and Gary Stahl M.D. who provided, inter alia, expert neurological testimony on behalf of the defendants.

*Deposition Testimony—Methodologies and Data Used by Expert Witnesses To Opine on General Causation*

A. Plaintiffs' Expert Witnesses

1. *Testimony of Ralph J. Wynn M.D. (Board certified in pediatrics and neurology)*

Dr. Wynn testified that in his opinion the minor plaintiff has brain damage resulting in cognitive disabilities and difficulties in interacting successfully with his environment. Deposition transcript, pp. 15-16, 20, 28. He also stated that minor plaintiff has neurologic disabilities relating to cognition and language that contribute to "autistic like" behaviors. See *id.* at 28-36.

Dr. Wynn has testified that the basis of his opinion is "not the result of any specific article, publication, or abstractions of the literature." See *id.* at 46, 70. Dr. Wynn also *could not identify any scientific literature to support his opinion* that postnatal hypoxia, or what he described as a "prolonged state of oxygen tissue debt and accompanying metabolic acidosis," would cause severe neurologic disability. See *id.* at 47. Dr. Wynn is unable to cite to any study which would support any component of his opinion in this case. See *id.* at 48.

Dr. Wynn further opined that inadequate ventilation and inadequate resuscitation efforts resulted in borderline oxygenation, which in turn resulted in hypoxemia, metabolic acidosis and a tissue oxygen debt in minor plaintiff, which in turn resulted in a neurologic brain disability. See *id.* at 50. Dr. Wynn has based his expert testimony in this case on *no independent reliable or valid scientific authority, but solely upon his own opinion based upon personal experience.* See *id.* at 53-54. Dr. Wynn was unable to point to any specific source, such as an epidemiological study, textbook or peer review or other journal article, which supports his professional opinion in this case. See *id.* at 57-58. Dr. Wynn has not conducted any research on the issue of whether oxygen tissue debt will result in brain damage, and is not even aware of any study that has concluded or even assumed that oxygen tissue debt results in cortical brain damage. See *id.* at 68-69.

Concerning his methodology in forming his causation testimony, Dr. Wynn testified that his opinion is based upon his review of the materials made available to him in this case and on his experience and knowledge. See *id.* at 79-82. He admitted that the materials presented to him are not truly scientific, peer review literature,

textbooks, articles, or authorities. See *id.* at 82-83. He further testified that he did *not* employ a scientific approach in arriving at his conclusions and opinions in this matter. See *id.* at 83-84.

## 2. *Testimony of Leon I. Charash M.D. (Pediatric Neurologist)*

Dr. Charash offered the opinion that the minor plaintiff has abnormal brain functions. Deposition transcript p. 19. More specifically, Dr. Charash opined that minor plaintiff is retarded with substantial behavioral problems which Dr. Charash thinks conform with pervasive behavioral disorder, and that he has severe communicative problems. See *id.* at 20. Dr. Charash further offered the opinion that he believes the alleged brain damage occurred "some time in the 12 hours after birth." See *id.* at 42.

Dr. Charash did not utilize any literature whatsoever in reaching his professional opinion, nor did he use any literature to influence, bolster or confirm his personal opinion. See *id.* at 59. Dr. Charash relied on sparse literature for the sole purpose of refuting opinions offered by defendants' experts, not to formulate or substantiate his *own* assertions. He specifically stated that *he did not use any of the literature cited to formulate any element of his opinion or to in any way influence his conclusion in this matter* but merely used this literature to refute the premise that "you must have [cerebral palsy] in order to have [mental retardation]." See *id.* at 45. He has not relied on any article cited to support his premises that perinatal asphyxia or persistent hypoxia over an interval results in brain damage, but merely to refute statements made by defendants' experts. See *id.* at 48-49. In fact, *Dr. Charash unequivocally testified that aside from himself and his own personal*

*experience, there are no other sources in which he has predicated his opinion in this case.* See *id.* at 65, 83-84.

## B. Defendants' Expert Witnesses

### 1. *Testimony of Leonard Graziani M.D. (Board certified in pediatric neurology)*

Leonard Graziani M.D. testified in his deposition that the minor plaintiff has autism with mental retardation. Deposition transcript p. 28. Specifically, according to the DSM IV, he suffers from pervasive developmental disorder, not otherwise specified. See *id.* at 29.

*Dr. Graziani testified as to the issue of causation that there is no medical literature indicating any association between neonatal hypoxemia and autism.* See *id.* at 40.

Dr. Graziani further testified that it is not possible to have a lowering IQ due to oxygen deprivation. See *id.* at 52. Dr. Graziani defines mental retardation as lowering the IQ score below the normal range. See *id.* at 53.

When asked whether he could tell what the cause of minor plaintiff's autistic condition is, Dr. Graziani responded, "[I]t is a developmental disorder of the brain that begins in the fetus. Now, if you come back one more step and say what caused the brain to be abnormal in fetal development, no. We don't know the answer to that, although, there are some clues . . . There are many studies that indicate a strong genetic component to autistic syndromes that are otherwise not further defined." See *id.* at pp. 65, 66.

Indeed, Dr. Graziani has testified that *"there is no known cause of the developmental disorder known as*

*autism. And again when I say no known cause we are really talking about the primary proximate reason why the child develops autism, sometimes referred to as a pathogenesis of the disorder, is in large part still uncertain and unknown."* See *id.* at 70.

## 2. *Testimony of Robert Stavis M.D. (Board certified in neonatology)*

Robert Stavis M.D. testified consistent with Dr. Graziani's testimony that minor plaintiff suffers from pervasive developmental disorder (PDD) which includes autism as part of its disease spectrum. Dr. Stavis further testified that everything he has read on minor plaintiff has talked about his autistic behavior and that this seems to be the most dominant and reproducibly mentioned aspect of his behavior. The doctor clearly testified that PDD includes autistic behavior and it includes autism. Deposition transcript, p. 48.

Dr. Stavis disagreed with plaintiffs' expert, Dr. Wynn, that minor plaintiff had a hypoxic ischemic brain injury while at Frankford Hospital—Torresdale Division that caused his autistic condition. Additionally, Dr. Stavis disagreed with plaintiffs' expert, Dr. Charash's conclusion, attributing minor plaintiff's condition to alleged hypoxic events which occurred at Frankford Hospital—Torresdale Division.

Specifically, Dr. Stavis testified with regard to Dr. Charash's report that

"There's no foundation for this whatsoever . . . He hasn't shown a rationale for it. He hasn't shown an analysis that would show any reason why he came to those conclusions whatsoever . . . what I see is a lack of analysis on one part, unsupportable [sic] statements . . . on his part . . . I don't think he has a

developed opinion. I don't think that he stated a physiologic basis for it . . . ." See *id.* at 61-63.

Directly on the issue of causation,

"Dr. Stavis testified in his expert opinion that he is not aware of any literature indicating an association between perinatal or neonatal events in children with pervasive developmental disorder or autism." See *id.* at 71.

Additionally, Dr. Stavis is not aware, nor has he ever seen in his own experience autism to be an outcome of postnatal hypoxia. See *id.* at 72.

### 3. *Testimony of David Behar M.D. (Board certified in child and adult psychiatry)*

David Behar M.D. testified that he understands minor plaintiff's problem to be, based upon evaluations of several unrelated individuals, that he suffers from autistic features and symptoms or pervasive developmental disorder, as well as severe mental retardation. Deposition transcript, pp. 16-17.

Dr. Behar testified that autism is a severe subset of pervasive developmental disorder. Its severity is measured by early onset in time and the severity of the dysfunctions that the patient exhibits. In essence, he testified that autism is a type of pervasive developmental disorder. See *id.* at 18.

When asked what his opinion was in relation to the possible cause of minor plaintiff's disabilities or problems, Dr. Behar testified that "[T]he most honest answer to that question is *unknown.*" See *id.* at 23.

Dr. Behar testified that if he was forced to speculate, he would say that minor plaintiff fits into a familial pattern that is seen oftentimes and he bases this on his understanding that minor plaintiff had a brother

who did not speak until the age of 2 1/2 and that he could speculate that minor plaintiff has *some unknown genetic abnormality* and that this was evidenced in his brother in a milder form. See *id.* at 25-27. *The bottom line is that Dr. Behar testified that the cause of Daniel Checchio's mental retardation and autism is unknown.* See *id.* at 27.

### 4. *Testimony of Hope Punnett Ph.D. (Clinical Geneticist)*

Hope Punnett Ph.D., testified that "[T]here are hundreds of syndromes in which there are developmental disorders." Deposition transcript, p. 15.

Her understanding as to minor plaintiff's current condition is that he has autistic tendencies and self-destructive tendencies, as well as mental retardation and some congenital abnormalities. See *id.* at 16.

Among his physical abnormalities, he has a large head circumference, clinodactyl of his fifth fingers, shortening of the fourth metacarpal, and disproportionate hand measurements and small penis and small genitalia. See *id.* at 16-17.

Dr. Punnett's expert opinion as set forth in her testimony is essentially that minor plaintiff's physical abnormalities must have occurred very early in gestation and she assumed some other abnormality, either metabolic or other, which has caused the autistic tendencies and the mental retardation to be of *prenatal origin* and all part of the same etiology. See *id.* at 31.

Further, Dr. Punnett testified that based upon her own experience and from the literature, only about one-half of all children with mental and physical abnormalities have a syndrome that can be named, identified, and its etiology understood. See *id.* at 31.

### 5. *Testimony of Joyce Mauk M.D.*
### *(Board certified in developmental pediatrics)*

Dr. Joyce Mauk testified that minor plaintiff's family history "supports more strongly to [sic] a familial or genetic idealogy [sic] of his developmental disability." Deposition transcript, p. 16. Dr. Mauk's findings after an examination of minor plaintiff were that he was moderately to severely retarded with an autistic disorder. See *id.* at 21.

When questioned by plaintiffs' counsel as to the cause of minor plaintiff's mental retardation and autistic disorder, Dr. Mauk clearly stated that an autistic disorder *cannot* be caused by moderate to severe mental retardation. As stated by the doctor, "They are associated disorders. One does not cause the other." See *id.* at 28-29.

Directly on the issue of causation, plaintiffs' counsel inquired of Dr. Mauk as to whether hypoxia could have caused minor plaintiff's developmental disorder. See *id.* at 36. Dr. Mauk explained that hypoxia could not explain minor plaintiff's problem as "it's never been proven to be a cause of autism." The doctor reiterated upon further inquiry on this point that, "there is no proven causal association between hypoxia and autism." See *id.* at 44, 58-60.

### 6. *Testimony of Gary Stahl M.D.*
### *(Board certified in neonatology)*

Dr. Gary Stahl testified that the minor plaintiff did not suffer from acidosis related to hypoxia because there was no hypoxia that occurred. Deposition transcript, p. 24.

Further, Dr. Stahl stated that minor plaintiff was never hypoxic to the degree that there was insufficient oxygen

available to his tissue so as to cause tissue hypoxia. In fact, Dr. Stahl referenced scientific studies quoted in his reports which indicated that babies with PO2s comparable to minor plaintiff's during the relevant time period grow normally without tissue hypoxia. See *id.* at 44. Dr. Stahl clarified that, "If there were sufficient hypoxia to cause tissue damage, the pH would not only be much lower but would have decreased and not improved" (as it did in Daniel Checchio's case). See *id.* at 45.

Dr. Stahl concludes that as stated in his report, "my opinion, within a reasonable degree of medical certainty, is that Daniel Checchio's neurologic problems are not related to either his respiratory distress or the care that he received at Frankford Hospital. See *id.* at 39.

### *Application of Pa.R.C.P. 1035.2 et seq., to Defendants' Joint Motion for Summary Judgment*

The Pennsylvania Supreme Court, in *Ertel v. Patriot-News Co.,* 544 Pa. 93, 674 A.2d 1038 (1996), embraced the reasoning of the U.S. Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), with regard to the standard of review to be applied to a motion for summary judgment. The court, in recognizing the unreasonableness of "allowing non-moving parties to avoid summary judgment where they have no evidence to support an issue on which they bear the burden of proof," held:

"[A] non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 101-102, 674 A.2d at 1042.

In applying these principles to the facts of this case, the question becomes whether plaintiffs' experts have provided any scientific basis, aside from their own subjective beliefs, that autism and/or pervasive developmental disorders are caused by hypoxia in the context of respiratory distress or respiratory distress syndrome. Succinctly summarized, plaintiffs' experts, pursuant to court-ordered depositions, have provided none of the following in support of their personal opinions:

"(a) [A] diagnostic imaging study of the minor plaintiff showing any brain damage;

"(b) any clinical research utilized in forming their opinion as to the cause of the minor plaintiff's developmental delay;

"(c) any research (epidemiological and/or peer-reviewed) proving, or even inferring, a causative relationship between sustained and serious hypoxia and brain damage in the neonatal period (resulting in mental retardation, pervasive developmental disorder or autism);

"(d) any peer-reviewed literature or treatise or chapters in relevant textbooks proving, or even inferring, a causative relationship between sustained and serious hypoxia and brain damage in the neonatal period (resulting in mental retardation, pervasive developmental disorder or autism)."

The deposition testimony of plaintiffs' experts (which are nothing more than "scientific hunches," *Christophersen v. Allied Signal Corp.*, 939 F.2d 1106, 1115 (5th Cir. 1991) fall far short of proffering a causal connection between postnatal hypoxia and the specific sort of developmental problems encountered by the mi-

nor plaintiff. Process of elimination is not a valid scientific method for determining the etiology of a disease—the "appearance" of a causal relationship or the absence of another clear explanation for the minor plaintiff's developmental disorder is not sufficient to establish legal causation. See *McMahon v. Young,* 442 Pa. 484, 276 A.2d 534, 535 (1971) (evidence of "probable" causation insufficient to make expert testimony admissible); *Niggel v. Sears, Roebuck and Co.,* 219 Pa. Super. 353, 355, 281 A.2d 718, 719 (1971) ("It is not enough to say that the alleged cause 'possibly,' or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result."). See also, *Hreha v. Benscoter,* 381 Pa. Super. 556, 560, 554 A.2d 525, 527, *appeal denied,* 524 Pa. 608, 569 A.2d 1367 (1989) (discussing required degree of medical certainty necessary to prove causation).

Further support for recognizing the insufficiency of plaintiffs' evidence is found in *McKenzie v. Westinghouse Electric Corp.,* 674 A.2d 1167 (Pa. Commw. 1996), *allocatur denied,* 547 Pa. 733, 689 A.2d 237 (1997), wherein the Commonwealth Court provided a rather extensive analysis of the qualification of experts in areas which are somewhat novel:[3]

"In order for expert testimony to be admissible, the party seeking to offer that testimony must provide an adequate foundation for doing so. *Commonwealth v. Khamphouseane,* 434 Pa. Super. 93, 642 A.2d 490, *petition for allowance of appeal denied,* 538 Pa. 666, 649 A.2d 669 (1994). A party does not lay an adequate

---

3. Although *McKenzie* is not binding upon the Superior Court, it was recently cited with approval by our Superior Court in *Blum v. Merrell Dow Pharmaceuticals Inc.,* (no. 3711 Phila. appeal dkt. 95) slip op. at p. 20.

foundation for expert testimony simply by presenting the testimony of its witness that he or she believes a particular proposition to be true based upon his or her own personal views and observations." *Id.* at 1171.

See also, *Krilowicz v. Owens-Corning Fiberglas Corp.,* 23 Phila. 448 (1992), *aff'd, Krilowicz v. Johns-Manville,* 433 Pa. Super. 621, 636 A.2d 1221 (1993), *allocatur denied,* 537 Pa. 664, 644 A.2d 1201 (1994).[4]

Before a jury may consider the testimony of plaintiffs' expert witnesses, they must provide a scientific basis aside from their own subjective belief that neonatal hypoxia was the proximate cause of minor plaintiff's neurological dysfunction. The record before this court

---

4. In *Krilowicz et ux. v. Owens-Corning Fiberglas Corp.,* 23 Phila. 448, the trial court addressed virtually the identical legal issue as we are faced with herein. The plaintiffs *in Krilowicz* filed an action against various asbestos manufacturers alleging damages to Mr. Krilowicz consisting of asbestos-related pleural thickening of the lungs which developed into constrictive pericarditis after working as a marine machinist at the Philadelphia Naval Shipyard beginning in 1965. The jury returned a verdict in favor of plaintiffs and awarded damages in the amount of $700,000. The trial court thereafter granted judgment n.o.v. The trial court found that plaintiffs' theory of causation, which alleged that asbestos-related pleural thickening caused Mr. Krilowicz's constrictive pericarditis, was legally insufficient because the testimony of plaintiffs' expert consisted only of the expert's individual clinical opinion, with the expert failing to point to any medical journal articles, general medical text, or specific medical text in support of this theory. Plaintiffs' expert acknowledged that, with the exception of a study of a single French man, there is no additional medical literature to support the theory linking constrictive pericarditis to asbestos-related pleural thickening and as such, plaintiffs' expert's failure to support her opinion with reference to medical literature despite being qualified as an expert medical witness, warranted its exclusion under *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977) and *Commonwealth v. Middleton,* 379 Pa. Super. 502, 550 A.2d 561 (1988).

discloses that plaintiffs' experts failed to point to a single medical text or journal article linking neonatal hypoxia with autism and/or pervasive developmental disorder.

Plaintiffs have asserted that this court improperly granted summary judgment since the opinions proffered by their experts are based upon their experience, training and knowledge in their respective fields of medicine and as such require a determination of credibility by a jury pursuant to the doctrine set forth in *Nanty-Glo Borough, supra.*

In *Nanty-Glo,* our Supreme Court held that oral testimony alone, either through testimonial affidavits or depositions of the moving party or the moving parties' witnesses is generally insufficient to establish the absence of material fact.[5]

However, the doctrine set forth in *Nanty-Glo* is not applicable to the instant case since plaintiffs' experts did not proffer testimony sufficient to meet the standard of admissibility set forth in *Daubert* and as such, the credibility of plaintiffs' experts is not an issue before this court.

Accordingly, for the foregoing reasons, this court's order dated July 31, 1997, should be affirmed.

---

5. We note that the recent Pennsylvania Supreme Court holding in *Ertel* and the enactment of Pennsylvania Rule of Civil Procedure 1035.2 appears to have in all practicality limited the *Nanty-Glo* doctrine to summary judgment motions where there is an issue of credibility involving an expert witness and where the movant bears the burden of proof at the time of trial.